UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| ETTA FANNING, <br>         Plaintiff, <br><br> v. <br><br> CITY OF SHAVANO PARK, TEXAS <br>         Defendant. | Civil Case No. 18-cv-803 <br><br> DECLARATORY AND INJUNCTIVE RELIEF SOUGHT |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff ETTA FANNING complains as follows:

**Preliminary Statement**

1.  This is a civil action for declaratory and injunctive relief arising under the First and Fourteenth Amendments to the Constitution of the United States. This suit concerns the constitutionality of several provisions of the City of Shavano Park's sign code ("sign code"), set forth in chapter 24 of the City's Code of Ordinances.

**Jurisdiction and Venue**

2.  This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. This civil action arises under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Plaintiff seeks a declaration of her rights in this case of actual controversy within this court's jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

3.  Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant City of Shavano Park is located in this district, and the Defendant's official duties are performed in this

district. Additionally, a substantial part of the events giving rise to this claim occurred in this district.

## Parties

4. Plaintiff Etta Fanning is an individual who resides in Shavano Park, at 418 Hampton Way.

5. Defendant City of Shavano Park, Texas is a Type A general law municipality in Bexar County, Texas with the capacity to sue and be sued. Its main address is 900 Saddletree Court, Shavano Park, Texas 78231. The City of Shavano Park, Texas is a subdivision of the State of Texas. The City of Shavano Park, Texas and its officials are responsible for creating, adopting, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs for the City of Shavano Park, Texas.

## Statement of Facts

### Signs for Bentley Manor Fourth of July Block Party

6. For the past nine years, residents from the gated community of Bentley Manor, a Shavano Park Subdivision Unit 17-A, have hosted a neighborhood block party in Bentley Manor to celebrate the Fourth of July and all Veterans who have served our country. The hosts of the block party are veterans and there are many veterans in the Bentley Manor community. Plaintiff Fanning is one of the hosts. Usually about 80-100 people attend. Residents from other communities of Shavano Park are also invited.

7. Small banners advertising the 2018 Fourth of July block party were hung, one each at the north and south gate exits of Bentley Manor, just as they have been for nine years.

8. Three yard signs were also displayed on private property and in the common areas of Bentley Manor.

9. The signs and banners were not visible from the City of Shavano Park streets, nor were they blocking vision or traffic. The HOA President, Adam Holzhower, complained to the City and Chief of Police.

10. A City code compliance officer arrived at the residence of the Bentley Manor resident whose address is displayed on the signs, and warned that they had seven days to take down the banners and signs per orders of the City of Shavano Park, pursuant to its Sign Code. That evening, the rain and wind blew everything down and the Fourth of July event was cancelled. No other notice, complaint, citation, or warning came from the HOA Board or the City of Shavano Park.

**Fourth of July Raincheck Block Party**

11. A Fourth of July Raincheck block party was rescheduled for Saturday, July 28 with the intent of getting the community together to chat and meet the new residents.

12. On Thursday, July 26, from 8:30-10:30 a.m., hosts hung small banners on two trees at the Bentley Manor gate exits, at the same location as they had been hung in previous years, and placed three small (approximately 18" by 24") block party signs in the yards of homeowners, with the homeowners' permission.

13. However, by around 4:00 p.m. that day, all banners and signs had been removed by Shavano Park Police Chief Lacy, who had again received a complaint from Adam Holzhower.

14. That evening, after signs were taken by the Chief of Police, Plaintiff Fanning (one of the block party hosts) talked to the City Manager and requested that the signs and banners be returned. She was told the Chief of Police would call her in the morning on July 27. The Chief never called. No one called to explain why signs and banners were taken, so she called an attorney.

15. At approximately 9:00 a.m. on July 27, Fanning's undersigned attorney emailed counsel for the City to demand that the City return the banners and signs immediately, and advised that Fanning would put them right back up. Fanning's attorney advised that the sign ordinances were unconstitutional and unenforceable because they incorporated content-based distinctions, incurring strict scrutiny, and yet the City could not defend its line-drawing favoring some signs and disfavoring others.

16. On the evening of July 27, the City Manager, Bill Hill, messaged her that one of the yard signs had been returned and placed on the homeowner's property and should not have been removed. However, City Manager Hill claimed that the other two signs were found at the edge of homeowners' properties in the HOA common area. The City Manager stated that those two signs were being held at the police station and would not be returned. No banners were returned and Fanning was told to speak to her attorney.

17. Also on the evening of July 27, the City's attorneys responded to Fanning's attorney's demand, stating in part that

> The City only seeks compliance and will return the remaining signs without issuing citations if we agree on the following:  1) Banners may not be placed at the entrance unless during the authorized period in October and by the HOA. 2) 18" x 27" signs can be displayed for this event if solely on private residential property with the property owner's permission. Adherence to these stipulations will be in conformance with the ordinance.

18. Plaintiff Fanning cannot agree that the City may enforce an unconstitutional ordinance, so she did not accept these terms and has not received her confiscated signs.

19. Because the City removed and confiscated Fanning's signs, she was unable to replace them so as to further advertise the Raincheck block party for July 28 and inform more neighbors of the gathering.

20. The City's retention of the signs prevented her from displaying her block party message from the time that the signs were removed by City law enforcement during the afternoon of Thursday, July 26, for all of Friday, July 27, and for all of Saturday, July 28.

21. The Raincheck block party was held as scheduled, in the evening of July 28, and dozens of people attended. Fanning believes more neighbors would have known and attended had she been able to display her message as desired.

## Relevant Law

**Shavano Park's Sign Regime**

22. The City has enacted a comprehensive sign regulation regime, found at Chapter 24 of the Code of Ordinances.

23. Structurally, Chapter 24 declares all signs—at least those on *private* property—to be unlawful, and punishable as public nuisances, unless a particular type of sign is otherwise allowed under Chapter 24:

> **Except as otherwise provided for in this chapter, it shall be unlawful to erect, display, maintain, or cause to be erected, displayed or maintained, on private property located in the City**, any advertising bench, animated or moving sign, awning, canopy or marquee sign, back-to-back sign, bandit sign, billboard, bill poster, electric sign, embellishment, flashing sign, monument sign, on-premise sign, prohibited neon, blinking, rotating, animated, moving, flashing or intermittently illuminated sign, pole sign, portable sign, pylon sign, any sign protruding above the building roof line or parapet line, painted or Day-Glo colored sign, banner sign, valance or display constructed of cloth, canvas, light fabric, paper, pliable vinyl, plastic or other light material, wall sign, any sign placed in exchange for a monetary or bartered benefit, any sign, displaying any matter in which the dominant theme of the material taken as a whole appeals to the prurient interest in sex, or is patently offensive because it affronts contemporary community standards relating the description or representation of sexual matters, and is utterly without redeeming social value. **Such action is hereby declared to be a public nuisance. Any sign not specifically listed as being allowed in this chapter is expressly prohibited**.

Code § 24-3.

24. Section 24-6 governs "Non-nuisance signs in residential zoning districts," such as relevant here in Bentley Manor. This section provides, in full:

> In A-1, A-2, A-3, A-4, A-5 PUD, MXD and CE zoning districts the following signs are hereby not deemed to be a public nuisance:
>
> (1) Upon final plat approval, a single sign may be erected temporarily on each approved plat or development, provided, however, that such sign shall not exceed 60 square feet in sign area, including its framing, trim and molding, and shall be placed so as not to interfere with the occupancy or use of any lots in the subdivision. All such signs shall be removed upon completion of the sale of 95 percent of the lots in the subdivision.
>
> (2) Each residential property may erect one sign on the property that conforms to the following requirements:
>
>   a. The sign cannot be displayed in such a manner that it can be visibly viewed from the public right-of-way for more than 60 days per calendar year;
>
>   b. The gross sign area shall not exceed six square feet in sign area including framing, trim and molding;
>
>   c. The sign shall not be higher than six feet above grade;
>
>   d. The sign shall not be placed on public property including a public easement or right-of-way; and
>
>   e. The sign cannot be an illuminated or backlit.
>
> (3) In encouragement of the practice of recognizing achievements and student activities, each residential property may erect two signs that conform to the following requirements:
>
>   a. The signs cannot exceed four square feet in sign area, including framing, trim and molding;
>
>   b. Signs shall be placed within ten feet of the front facing of the primary residence;
>
>   c. Signs shall not be higher than four feet above grade;
>
>   d. The sign cannot be an illuminated or backlit.
>
> (4) During the period the residential property is listed for sale or lease, a sign may be erected on the property, subject to the restrictions noted in section 24-6(2)(b)—(e). Residential lots fronting on two streets shall be allowed one sign facing each street.
>
> (5) Signs during voting periods. Each residential property may erect signs in addition to those described in section 24-6(2) and section 24-6(3) during voting periods, as defined in section 24-2, subject to the following restrictions:

      a.   No sign may be erected more than 60 days prior to the start of the voting period;

      b.   All signs must be removed by 11:59 p.m. the day following the voting period;

      c.   The total sign area of all voting period signs must be no more than 36 square feet, and no one sign shall be larger than 24 square feet;

      d.   No voting period sign may be higher than six feet above grade; and

      e.   The signs cannot be illuminated or backlit.

    Signs erected in violation of these regulations are considered a nuisance and may be removed by the City Manager or his/her designee.

Code § 24-6.

25.    Section 24-6 thus draws distinctions between different types of signs based on their content, and subjects them to different regulations.

26.    First, it provides certain specifications that seem to be related to commercial advertisement of subdivision plots: "Upon final plat approval, a single sign may be erected temporarily on each approved plat or development," which may be "60 square feet in sign area," and must "be removed upon completion of the sale of 95 percent of the lots in the subdivision." Code § 24-6(1).

27.    Then, subsections (2) through (5) regulate different types of signs on residential property.

28.    Each residential property may erect one sign, visible no more than 60 days per year, that is limited to six square feet in sign area, and no higher than six feet above grade. Code § 24-6(2). Fanning refers to this as the "one sign" dispensation.

29.    But "[i]n encouragement of the practice of recognizing achievements and student activities, each residential property may erect two signs" limited to four square feet in sign area, no higher than four feet above grade. Code § 24-6(3). These signs must be within ten feet of the front of the residence. Id.

Orig. Complaint                                  7

30. The Code separately treats "[s]igns during voting periods," stating that "each residential property may erect signs in addition to" the "one sign" allowed for 60 days and the two student achievement signs. Code § 24-6(5). Such "voting period" signs cannot exceed 36 square feet in "total sign area of all voting period signs," and no single voting period sign may be larger than 24 square feet. *Id.* They cannot be higher than six feet above grade, and may only be displayed from 60 days "prior to the start of the voting period" though 11:59 p.m. of "the day following the voting period." *Id.* Importantly, "voting period corresponds only with elections administered by Bexar County." *Id.* § 24-2.

31. But signs advertising a residence for sale or lease receive treatment more favorable than the "one sign," or the two student achievement signs, or the voting period signs, in material ways. *Id.* § 24-6(4).

32. A residential sale or lease sign may be six square feet in area, and no higher than six feet above grade, like the "one sign" allowed under § 24-6(2), but not limited to 60 days per calendar year. Id. Instead, a residential sale or lease sign is permissible "[d]uring the period the residential property is listed for sale or lease," *id.*, that is, with no hard temporal restriction. Moreover, "[r]esidential lots fronting on two streets shall be allowed one sign facing each street." *Id.*

33. "Banner signs" are another category defined by Shavano Park and are subject to still different regulations:

> Banner signs in residential zoning districts are allowed subject to the following requirements:
> (1) Banner signs may be erected by property owners' associations as defined by the Texas Residential Property Owners Protection Act.
> (2) Each property owner's association may erect one banner sign at each entrance.
> (3) Each residential property owner may erect one banner sign.

> (4)   No banner sign may be erected more than seven days prior to the first Tuesday in October.
>
> (5)   Banner signs must be removed by 11:59 p.m. the day following the first Tuesday in October.
>
> (6)   Banner signs on public property shall be governed by a separate City policy.

Code § 24-7.

34. Thus, while each residential property owner "may erect one banner sign," this is only permitted in the last "seven days prior to the first Tuesday in October." *Id.* §§ 24-7(3), (4). While this severe temporal restriction is untethered to any particular event on its face, the intent and effect of this provision is to permit "banner signs" related to National Night Out. According to the website of the National Night Out organization:

> National Night Out is an annual community-building campaign that promotes police-community partnerships and neighborhood camaraderie to make our neighborhoods safer, more caring places to live. **National Night Out enhances the relationship between neighbors and law enforcement while bringing back a true sense of community. Furthermore, it provides a great opportunity to bring police and neighbors together under positive circumstances**.
>
> Millions of neighbors take part in National Night Out across thousands of communities from all fifty states, U.S. territories and military bases worldwide on the first Tuesday in August (Texas celebrates on the first Tuesday in October). Neighborhoods host block parties, festivals, parades, cookouts and various other community events with safety demonstrations, seminars, youth events, visits from emergency personnel, exhibits and much, much more.

National Night Out, https://natw.org/about (last visited Aug. 2, 2018) (emphasis added).

35. Shavano Park's banner sign provision therefore permits banner signs timed to coincide with National Night Out, and presumably messages about other events or issues if displayed during the same timeframe, but renders any banner signs displayed during any other time of the year to be unlawful public nuisances.

Orig. Complaint                                                9

36. While these strict regulations, subjecting different signs to different regulations depending on their content, apply to signs on private property, "[s]igns located on public property shall be governed by a separate City policy." Code § 24-2 (definition of "public property"). *See also* § 24-11(b) ("The City Council reserves the right to establish policies governing signage on City property.").

**Penalty Provisions**

37. "Signs posted or placed in violation hereof are hereby declared to be public nuisances and such violations shall be reported promptly to the Chief of Police or City Code Compliance Officer." Code § 24-15.

38. "The City Code Compliance Officer (or such other individual or classification of individuals as may be appointed by the City Council) may issue a citation requiring the removal, relocation, or reconstruction of any sign which does not meet the spacing, height, size and setback requirements of this chapter and other City ordinances for which the erection or construction was began on or after the effective date of the ordinance from which this chapter is derived." Code § 24-12.

39. A nuisance violation is punishable by a fine of up to $2,000, with each day of continuation of the nuisance constituting a separate offense. Code § 1-10 (general penalty).

40. "Each act of violation and each day upon which any such violation shall continue or occur shall constitute a separate offense." Adopting Ordinance, Ord. No. 300-01-09, § 4 (2009). "In addition to the penalty prescribed above, the City may pursue other remedies such as abatement of nuisances, injunctive relief and revocation of licenses or permits." *Id.*; *see also* Code § 20-26 (also providing for cumulative relief, including injunctive relief, against violations).

### First Amendment Principles

41.     The government always bears the burden of justifying speech-restrictive laws. *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 425 (5th Cir. 2014).

### Permanent Injunctive Relief

42.     Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

43.     The Shavano Park sign code has deprived, and will continue to deprive, Plaintiff of her fundamental rights protected by the First and Fourteenth Amendments. Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable. Accordingly, appropriate injunctive relief and a declaration of the unconstitutionality of the statutes are necessary.

44.     Plaintiff faces a credible threat of prosecution if she posts any "sign" in violation of the strict requirements of the sign code.

45.     Plaintiff is not willing to expose herself to criminal and civil penalties, and thus she has been forced to refrain from engaging in core expressive activity pending vindication of her constitutional rights. Not only was she already injured by the removal and confiscation of her signs, preventing their further display, but she was also unable to create and display different or new signs without incurring further potential penalties imposed by the City.

46.     Plaintiff intends to engage in the activity indicated below, and unless the unconstitutionality of the challenged restrictions is recognized, Plaintiff's First Amendment rights will be restricted by preventing her from carrying out her desired expressive activities in these specific intended instances and in other similar intended circumstances.

47. The free speech and associational rights of others not before the Court will be similarly infringed as the challenged provisions are applied to other Shavano Park residents and enforced by these Defendants. *See Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974); *Catholic Leadership*, 764 F.3d at 423-24.

## COUNT 1

### The banner sign limitation is facially unconstitutional because it is not appropriately tailored to further any proffered government interest.

48. Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

49. The banner sign limitation, Code § 24-7, singles out a particular type of sign ("banner signs") and strictly prohibits any such signs, except for a narrow window the week before National Night Out.

50. Plaintiff desired to, and would have, displayed a banner sign in her own yard, and requested willing neighbors to display banner signs in their yards, if the sign code did not strictly prohibit doing so, to advertise the 2018 Fourth of July block party and Raincheck block party. Because she could not do so without violating the sign code (which permits no banner signs in a resident's own yard except preceding National Night Out in October), her rights have already been violated in 2018.

51. Plaintiff further desires to display a banner sign in her yard advertising the Fourth of July block party in future years, and to ask willing neighbors to display banner signs in their yards in future years.

52. Plaintiff further desires to display a banner sign in her own yard expressing other messages of her choice, as political, policy, or other occasions may arise, not limited to the narrow window before National Night Out.

53. Plaintiff further desires to display banner signs at the exits of Bentley Manor just as has been done for the past nine years advertising the Fourth of July block party.

54. The banner sign limitation is a content-based speech restriction for two reasons. First, it is content-based on its face in that it is limited to a narrow temporal window during the calendar year that coincides with National Night Out. Even in the absence of further evidence, this coincidence reflects a preference for supporting banner signs regarding one particular event. It is thus content-based on its face and subject to strict scrutiny.

55. Second, the evidence will reflect that the City Council did in fact allow this one narrow exception for banner signs because of its desire to support National Night Out, even though it banned similar signs at any other time of the year. The limitation is thus content-based on account of the City Council's subjective motivation.

56. As a content-based speech restriction, the banner sign limitation is subject to strict scrutiny. The City must therefore justify the narrow temporal window in which banner signs are permitted by demonstrating that the temporal window is narrowly tailored to furthering a compelling City interest. The City cannot do so.

57. However, Plaintiff will prevail even under intermediate scrutiny. The City cannot defend its banner sign limitation because whatever aesthetic rationale it claims supports a limit on banner signs, such rationale is not even rationally related to this provision that makes an exception for a particular window during the year.

58. With respect to banner signs at "each entrance," the banner sign limitation is further content-based in that it censors speech of all but "property owners associations as defined by the Texas Residential Property Owners Protection Act." Code § 24-7(1). Code §§ 24-7(1) and (2) are not mere police regulations protecting property owners' use of their property or furthering the

government's interest in enforcing trespass laws. The provisions are not general provisions directed at any trespass, but rather are targeted to regulate only "banner signs," which are speech. "Sign means an outdoor structure, sign, display, light device, figure, painting, drawing, message, plaque, poster, billboard, *or other thing that is designed, intended, or used to advertise or inform*." Code § 24-2 (emphasis added). Placing one's property on the property of another is potentially punishable by trespass regulations, and if not, the City's code could be revised to ensure that it is. But here, the City has singled out only property that expresses a message, and then limited the ability to express a message at "each entrance" (entrance *to what* is not exactly clear) *to certain types of associations*. The City cannot defend these distinctions under any level of scrutiny, as they are unrelated to any legitimate government interest. For example, if the City proposes that § 24-7 is supposed to be read to permit the property owners association for a particular neighborhood, and nobody else, to display banner signs at "each entrance" to that neighborhood (which is not at all clear), then the provision would allow such banners in neighborhoods *represented by a property owners' association* but prohibit banners at "each entrance" of neighborhoods *not* represented by a property owners' association. This distinction is unrelated to any aesthetic objective of the City; rather, its effect is to permit or prohibit banner signs at "each entrance" based on the identity of the person or entity wishing to display it, which is government censorship based on the identity of a speaker.

59.     The banner sign limitation is further unconstitutional because the exception granted to the City itself renders the provision underinclusive. *See* Code § 24-7(6) ("Banner signs on public property shall be governed by a separate City policy."). This underinclusiveness undermines any argument that the limitation is necessary to further a legitimate government

objective, but instead indicates that it was passed simply out of a desire to limit speech of others while leaving the City free to display its own banner signs as it pleases.

60. The banner limitation violates the First Amendment rights of speech and association of Plaintiff and of any and all persons who desire to or would display similar signs, at Plaintiff's request or on their own.

61. The banner limitation also violates the First Amendment rights of members of the public, as it prevents them from viewing the messages that would otherwise be displayed on banner signs at times of the year other than immediately preceding National Night Out.

62. The banner limitation has deprived, and will continue to deprive, Plaintiff and others similarly situated of their fundamental rights protected by the First and Fourteenth Amendments. Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable. There is no adequate remedy at law.

## COUNT 2

**The dispensation for "one sign" that may be displayed no more than "60 days per calendar year" is facially unconstitutional because it is not appropriately tailored to any legitimate government interest.**

63. Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

64. Even if the City's claim is correct that two of the yard signs placed with the permission of the homeowner were encroaching on the property of the homeowners' association—a specific claim that Plaintiff is in no position currently to evaluate—the City had no authority to confiscate said signs because the relevant provision (Code § 24-6(2)) is facially invalid and unenfroceable.

65. The distinctions between this "one sign" limitation and the limitations on residential sale or lease signs are content-based and afford more favorable treatment in materials

ways to sale or lease signs than the "one sign" that may express political, ideological, or other messages.  A residence may post two sale or lease signs, if the residence fronts on two streets, whereas the same residence may not do so with signs expressing other messages.  Moreover, sale or lease signs are not subject to a strict 60-day limit.

66. The "one sign" category is also treated differently than signs "recognizing student achievements and student activities," for which two signs are allowed with no temporal limitations.

67. These distinctions are content-based, yet the City cannot defend such line-drawing under any level of scrutiny, as these distinctions are unrelated to any legitimate government interest.

68. The "one sign" limitation has deprived, and will continue to deprive, Plaintiff and others similarly situated of fundamental rights protected by the First and Fourteenth Amendments. Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.  There is no adequate remedy at law.

69. Plaintiff has incurred actual damages in the amount of at least $200, representing the amount invested in the signs confiscated and not returned by the City.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. A declaratory judgment that Code sections 24-6(2), (3), (4), and (5), and 24-7, are facially unconstitutional under the First Amendment to the United States Constitution;

2. A declaratory judgment that Code sections 24-6(2), (3), (4), and (5), and 24-7, are unconstitutional under the First Amendment to the United States Constitution as applied to Plaintiff;

3.	A permanent injunction enjoining Defendant from enforcing Code sections 24-6(2), (3), (4), and (5), and 24-7, against Plaintiff or against any other person;

4.	An award of nominal damages for the violation of Plaintiff's constitutional rights;

5.	An award of compensatory damages;

6.	An order that the City return the confiscated signs;

7.	Reasonable and necessary attorneys' fees and costs pursuant to 42 U.S.C. § 1988 or any other applicable statute or authority; and

8.	Any other relief that the Court deems just and appropriate.

Respectfully submitted,

_____/s/ Jerad Najvar_____
Jerad Wayne Najvar
Texas Bar No. 24068079
NAJVAR LAW FIRM, PLLC
2180 North Loop West, Suite 255
Houston, TX 77018
281.404.4696 phone
281.582.4138 fax
jerad@najvarlaw.com
*Lead Counsel for Plaintiff*