```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3
    ETTA FANNING,                  .
 4                                 .
                   PLAINTIFF,      .
 5        vs.                      . DOCKET NO. 5:18-CV-803-XR
                                   .
 6  CITY OF SHAVANO PARK, TEXAS,   .
                                   .
 7             DEFENDANT.          .

 8

 9
              TRANSCRIPT OF MOTION PROCEEDINGS
10        BEFORE THE HONORABLE XAVIER RODRIGUEZ
               UNITED STATES DISTRICT JUDGE
11                   JANUARY 10, 2019

12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFF:       JERAD W. NAJVAR, ESQUIRE
17                           NAJVAR LAW FIRM PLLC
                             2180 NORTH LOOP WEST, SUITE 255
18                           HOUSTON TX 77018

19
    FOR THE DEFENDANT:       CHARLES STRAITH FRIGERIO, ESQUIRE
20                           HECTOR XAVIER SAENZ, ESQUIRE
                             RIVERVIEW TOWERS
21                           111 SOLEDAD, SUITE 840
                             SAN ANTONIO TX 78205
22

23  REPORTED BY:             GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
24                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
25
```

1        *(San Antonio, Texas; January 10, 2019, at 10:30 a.m., in*
2   *open court.)*
3           THE COURT:  18 civil 803, Etta Fanning versus City of
4   Shavano Park.
5           MR. NAJVAR:  Good morning, your Honor.  Jared Najvar
6   for plaintiff, and I have here with me my associate, Austin
7   Whatley.  And just a caveat about that, he just passed the bar
8   exam and his application is going to be forthcoming, but my
9   understanding is he had to get -- so I just don't want to
10  represent to the Court that he's formally appearing, but he is
11  here.
12          THE COURT:  But Mr. Whatley is now licensed?
13          MR. WHATLEY:  Yes, sir.
14          THE COURT:  Okay.  So your verbal motion for
15  admission pro hac vice is granted.
16          MR. WHATLEY:  Thank you, your Honor.
17          MR. FRIGERIO:  Good morning, your Honor.  Charles
18  Frigerio and Hector Saenz for the City of Shavano Park.
19          THE COURT:  Thank you.
20          So I guess we have a couple of things here.  Let's
21  tackle, I guess, the request to file a first amended complaint
22  first, and then we'll go backwards.  So I understand you want
23  to file an amended complaint and add a new plaintiff, and
24  aren't these really two separate lawsuits?  It seems to be the
25  other plaintiff's seeming to challenge wanting to put signage

1 in public areas, in front of city hall, and Miss Fanning's

2 allegations are about what the sign restrictions are and their

3 impact on her home.  I mean, why should we put these two very

4 different cases altogether?

5        MR. NAJVAR:  So just to clarify the allegations in

6 the proposed amended complaint, so the proposed plaintiffs

7 moved -- it's true that part of the complaint talks about how

8 she had her campaign signs removed from city hall in 2017, but

9 it also alleges that her signs were placed at various

10 residences during that same campaign and that she removed

11 those after the City instructed her to do so, and those were

12 some 4 by 8 signs and also some smaller 3 by 5 banner signs.

13 So she removed those actually.  The allegation is she removed

14 those from private residences as well.

15        THE COURT:  But is Smoot going to -- if we combine it

16 all in one case, is Smoot going to want to put signage in the

17 public areas of city hall and other parks and stuff like that?

18        MR. NAJVAR:  Well, her allegations going forward also

19 include additional signs she wants to put at her residence.

20        THE COURT:  Yeah.  So I'm okay with residences being

21 all in the same lawsuit, but my concern is extending this to

22 public areas.  It sort of makes it a completely different

23 lawsuit.  And so if Smoot is seeking that relief, it needs to

24 be a separate lawsuit.  If Smoot is not going to seek that

25 relief, and both cases are dealing with private residences and

1  signage on private residences, I'm okay with it being

2  together.

3        MR. NAJVAR:  So I think there are allegations that go

4  to -- part of my argument, as to the facial invalidity of the

5  sign code altogether, arises from the argument that the City

6  regulates separately signs that are on city property.  And

7  that goes to, I would argue, a content base distinction that

8  puts the whole thing --

9        THE COURT:  I got all of that too.  But so Miss

10 Fanning has never sought as part of the relief that she's

11 requesting in this case the ability to put signage in public

12 areas.  Smoot is.

13       MR. NAJVAR:  Well, that's true.  And just to finish

14 the point, your Honor, so because it's a facial challenge to

15 that extent, the fact that the allegation, the argument is

16 that the separate regulation, the separate rules for signs on

17 city property, even if no plaintiff -- and I don't believe I

18 have an allegation that the plaintiff wants to put signs on

19 city property, but the fact that it is regulated separately is

20 par for the course in a facial First Amendment challenge, even

21 without an allegation that the plaintiff wants to do that.

22 And so that's why that argument is relevant.

23       And, again, I don't believe I've alleged intent to

24 display signs, you know, specific challenge to how they are

25 regulated on the city property.

1          THE COURT:  So that National Night Out distinction, I

2     understand where you are going with that, and that is all

3     applicable with Smoot.  Why is that applicable with Fanning?

4     I mean, Fanning's case is I want to put signs, I want to put,

5     apparently, an unlimited number of signs, and apparently I

6     want to put up signs of unlimited dimensions in a residential

7     area.  That's quite different than what Smoot is asking for.

8          MR. NAJVAR:  Well, I think you, you've reversed the

9     names of the plaintiffs there.  So Smoot is the one who is

10    alleging she wants to put additional numbers of signs in her

11    own yard.  So, but to your point, you are right.  So if you

12    just look at it sort of broadly, Fanning's complaint deals

13    more with a National Night Out situation, although she does

14    allege that she wants to put additional signs, banner signs,

15    in her own yard on political issues.  That's paragraph 52 of

16    the original complaint.  So it's not just limited to the

17    National Night Out signs.

18          But it is true, Smoot's allegations center more on

19    and illustrate how the sign code restricts political signage

20    and policy signage.  But I would argue they clearly should be

21    part of the same case, your Honor, because while they help --

22    those facts help illustrate how the sign code regulates

23    different types of signs and different types of content, both

24    of the plaintiffs are making the same arguments, though, in

25    terms of -- so those facts give each one standing

1  independently, but, you know, if you have standing because you
2  want to put up a certain type of sign, you are making the
3  argument that the different regulations of different types of
4  signs constitute a First Amendment violation to the extent the
5  code is applied to me.  Both of them are making that argument,
6  even though they are coming from different places to make it.
7  It puts the entire sign code in play.
8       THE COURT:  But let me ask you one question.  The
9  Homeowners' Association, so wherever Miss Fanning is living, I
10 mean, doesn't the Homeowners' Association rules and
11 regulations trump whatever city -- can't the HOA establish
12 more stringent restrictions than what the City may have?
13      MR. NAJVAR:  Well, they can, because that's a
14 contract issue.  And part of that is --
15      THE COURT:  So isn't that a difference between Smoot
16 and Fanning's cases, why they should be two different cases?
17      MR. NAJVAR:  Well, but the problem with that is that,
18 so it's true that Fanning may have a claim or a dispute with
19 her Homeowners' Association to the extent that she can go to
20 them and say, you know, I have a right to have this sign here
21 under our agreement, and, you know, there is nothing in the
22 HOA agreement that precludes it, or that there might be some
23 procedures that were supposed to have been followed.  You
24 know, she gets a notice saying, hey, your sign is out of
25 compliance under the HOA agreement.  But all of that is

1 | irrelevant here because the HOA didn't enforce it.  The City
2 | is the one who sent its enforcement authorities.
3 |   THE COURT:  I thought the HOA president is the one
4 | that started it all.
5 |   MR. NAJVAR:  Well, the allegation is that he's the
6 | one who called the police to make the complaint, but the
7 | police are the ones who went and picked up the signs.  And
8 | that was an enforcement of the sign code.
9 |   THE COURT:  Was that the intent of the HOA president?
10 | Was he trying to enforce the HOA deed restrictions, or was he
11 | trying to enforce the City, or -- I don't know what's going on
12 | in the neighborhood fights going on back there.  Did he just
13 | not want to deal with calling Miss Fanning, so he called the
14 | police in lieu of?
15 |   MR. NAJVAR:  If I had to presume what his motive was,
16 | I think it was that he didn't want to go through the notice
17 | procedures that he had to follow under the HOA agreement, so
18 | he used the City to enforce the sign code.
19 |   THE COURT:  Yeah.  That's my guess as well.  These
20 | are two separate lawsuits, and so the motion for leave to file
21 | the first amended complaint is denied.
22 |   So then let's turn to the underlying motion to
23 | dismiss on the Fanning case.
24 |   Mr. Frigerio, I mean, how has she not established a
25 | case, at least for pleading?

1      MR. FRIGERIO:  By her own pleadings she admits that

2  the banner was on the Homeowners' Association property.  It

3  was not her property.

4      THE COURT:  But so her complaints are twofold.  One,

5  she's complaining about her property.  And then she complains

6  about signage at the gate.  Right?

7      MR. FRIGERIO:  Well, my interpretation of her

8  pleadings was the banner, the only banner, wasn't on her

9  property.  The banner was on the homeowner's property, not on

10  her property.  And there was another allegation that there was

11  a sign on someone else's property, but I do not recall in the

12  pleadings that it was ever on her property, which is really

13  the whole basis for the standing issue.

14      THE COURT:  So I'm looking at paragraph 8 and it

15  says:  "Three yard signs were also displayed on private

16  property and in the common areas."  So I guess I just took

17  that as being there was a sign that she was complaining about

18  at her house and other houses.  And so on paragraph 12 she

19  talks about "party signs being placed in other yards of

20  homeowners with the homeowner's permission."  I mean, so isn't

21  she talking about placement of signs that she put in her house

22  and that she asked her neighbors and they agreed?

23      MR. FRIGERIO:  Now, that is not my understanding, and

24  that's why we filed the motion.  It was not her property.  It

25  was homeowner's property and property of someone else who is

1  not a plaintiff to this suit.

2         THE COURT:  So, Mr. Najvar, do you want to respond to

3  that?  I mean, I guess that's the way I read it.  Maybe

4  instead of a motion to dismiss, this ought to be a motion for

5  clarification of the pleadings?  I mean, what are you

6  complaining about?  What did Miss Fanning do and what —— and

7  where were these signs at?

8         MR. NAJVAR:  Well, just to clarify a factual point, I

9  think your Honor is looking at —— you've referenced paragraph

10  12, I believe, of the original complaint.  Okay.  So paragraph

11  6 through 10.

12         THE COURT:  So that's where I was.  I started with

13  paragraph 8.

14         MR. NAJVAR:  Okay.  Right.  So that's discussing the

15  original Fourth of July signs, Fourth of July party signs.

16  That party was rained out, so then they had a Rain Check.

17  They made Rain Check signs and they essentially did the same

18  thing.

19         THE COURT:  But where were the signs put?

20         MR. NAJVAR:  There is a distinction here between the

21  original signs and the Rain Check party signs, because the

22  paragraph you referenced references how they put them in

23  common areas of homeowner property, Homeowners' Association.

24  That did not happen again when they did it with respect to the

25  Rain Check party.

1        THE COURT:  Let's stop.  I'm real linear.  Sorry.  So

2    the act that the City intervened in was the Rain Check; right?

3        MR. NAJVAR:  Right.

4        THE COURT:  So with regard to the Rain Check signs,

5    where were they put?

6        MR. NAJVAR:  At three residences in Shavano Park with

7    the homeowner's permission.

8        THE COURT:  What about her own property?  Did she put

9    them there?

10        MR. NAJVAR:  She self-censored.  She did not put a

11    banner sign on her own property because it was July.  She

12    couldn't do that under the banner sign provision.  They put

13    the banner signs at the exits of the neighborhood.  So there

14    were three yard signs that were put with homeowner's

15    permission at homeowner's residence property for the Rain

16    Check party, and there were two banner signs at the exits of

17    Shavano Park.

18        THE COURT:  So she did not even put a sign at her own

19    house?

20        MR. NAJVAR:  She did not put a banner sign, because

21    those Rain Check signs, they had some yard signs that they

22    distributed to other yards.  She could not put a banner sign

23    in her own yard because the code specifically bans banner

24    signs, other than this certain period.

25        THE COURT:  Yeah.  Those are banner signs though.

1  Did she just stick any kind of sign in her yard, saying the

2  party is going to be held here on this date?

3        MR. NAJVAR:  I don't believe she did.  I'm not --

4  that's not in the pleadings.  But the fact is she had a banner

5  sign and she put it at the exit.  She alleges specifically she

6  would have put a banner sign in her own yard but she could not

7  because of the banner sign prohibition.

8        THE COURT:  So to Mr. Frigerio's point, how is she

9  injured?

10        MR. NAJVAR:  Well, that injury is self-censorship.

11  That injury is chilled speech, the fact that she alleges that

12  she desired to put the banner sign in her own yard and asked

13  her neighbors to display banner signs in their yards, but she

14  specifically says we did not do that because the sign code

15  prohibits it.

16        That is an injury for First Amendment purposes, the

17  fact that she didn't go through with desired speech.  It's --

18  you have an injury in fact for First Amendment injury.  All

19  you have to do is allege a desire to engage in conduct that's

20  arguably affected with the constitutional interest.  Here it

21  clearly is.  It's, you know, sign is speech.  That's clear.

22  She wanted to put it there.  She self-censored and did not do

23  that.

24        THE COURT:  So I can see it as to her property, but

25  where does she have the right to put it on the public, common

1  areas of the HOA?

2        MR. NAJVAR:  Well, she —— and this is a little finer

3  point, because if you look at the sign code, the banner sign

4  prohibition says:  "The only party who can post a sign at the

5  entrance —— it doesn't say entrance to what —— it says at the

6  entrances, are Homeowners' Associations."

7        Now, you can read that and think, it meant to, you

8  know, describe entrances to a neighborhood that's governed by

9  that Homeowners' Association, but it doesn't actually say

10  that.  It just says at the entrance.  So if you think of —— I

11  mean, so this case sort of points up an issue.  There's a

12  vagueness issue I've alluded to here, or alleged here, what is

13  the entrance and what is the exit?  Her signs ——

14        THE COURT:  But where does she even have a right to

15  put them there?  I mean, I don't have a right to go to the HEB

16  property down the street and stick a sign.  I don't own the

17  property there.  And so she doesn't own the gate.  And so how

18  can she be injured by not being able to put up a sign in a

19  place that she doesn't own?

20        MR. NAJVAR:  Well, the injury is that we don't know

21  exactly where the sign was.  There is nothing in the record at

22  this point that establishes where it was exactly, or whether

23  it was actually HOA property, as opposed to that homeowner's

24  property who is right there at the edge of the entrance.  And

25  so but the City removed it under this banner sign provision.

1  So it's the City removed it under the, you know, as an

2  enforcement of the banner sign prohibition.

3        We're alleging that that's a First Amendment injury

4  because the banner sign prohibition is unconstitutional for

5  all the various reasons that are in the complaint, that the

6  entire sign code is invalid, that the entire sign code is

7  unconstitutional, and that that banner sign prohibition is

8  speaker-based censorship based on the identity of the speaker

9  because it limits the right to put a sign at a certain place

10  to a certain type of person without describing whether that

11  area that which the HOA can put a sign must be their own

12  property or, you know, the residence property that's right

13  there at the entrance.

14        That banner sign -- so it was an enforcement of the

15  sign code.  At this point, at the pleading stage, there is

16  nothing establishing that that wasn't some homeowner's

17  property, as opposed to the HOA's own property.

18        THE COURT:  But even if it's a homeowner's property,

19  it wasn't Miss Fanning's property.

20        MR. NAJVAR:  Well, that's true, but she put it with

21  neighbor's permission.

22        THE COURT:  Not at the gates.

23        MR. NAJVAR:  I'm sorry?

24        THE COURT:  Not at the gates.  I'm not talking about

25  the signs that she put in at her homeowners, with the

1  homeowner's permission.  I'm talking about the other

2  locations, like the gates.  She doesn't own those.  So how

3  does she get to -- even if there is a challenge to the City's

4  ordinance, how does she get to challenge putting up signs and

5  locations she doesn't have rights to?

6          MR. NAJVAR:  Well, for one, because if you are

7  looking at specifically just the banner sign prohibition, it's

8  vague.  And I've made that argument.

9          THE COURT:  I get all of that.  But, I mean, just

10  like, to use my hypothetical, I can't go to the HEB down the

11  street here and stick a sign.  I don't own it.  It's private

12  property owned by somebody else.

13          MR. NAJVAR:  But the argument, your Honor, is that

14  the prohibition says you can't put it at the entrance.  There

15  is no definition of the entrance.  Where does that extend to?

16  You know, you have, you know, public rights of way that

17  probably go right onto the gate almost or past the gate, and

18  you have a homeowner right on the other side of the gate on

19  the inside of the neighborhood whose property extends to a

20  certain line, and so it's vague.  To the extent it says --

21          THE COURT:  Yeah.  We're talking over each other, or

22  you're doing a very good job of trying to overcome the

23  deficiency I'm highlighting here.  She doesn't own that area.

24  Whether the City ordinance is vague as to what is described as

25  an entrance doesn't matter, if she doesn't own that property

1    where she could have put that sign.

2         MR. NAJVAR:  Well, no, it does, your Honor, because

3    it's a First Amendment claim.  It's a freedom of speech and

4    association.

5         THE COURT:  So I can go, I personally can go to any

6    Homeowners' Association, I can go to the Dominion and demand

7    that they put one of my signs up there?

8         MR. NAJVAR:  No, but you can go to --

9         THE COURT:  So then how is it that Miss Fanning can

10   go and demand, even if it's her own HOA, how can she demand to

11   put a sign there?

12        MR. NAJVAR:  Think of it this way.  She can go to her

13   friend's house who lives immediately inside the gate and

14   say --

15        THE COURT:  You're doing a great job of avoiding the

16   hard question.  We're not talking about the residences.  We're

17   talking about the gates and entrances.

18        MR. NAJVAR:  Well, no, but, your Honor, respectfully,

19   that's the -- that's what this whole vagueness claim puts in

20   issue.  The issue is --

21        THE COURT:  I got that point.  I got that point.  You

22   are claiming that the entrance is vaguely asserted in the City

23   ordinance.  But I can't, as much as I'd like, to exercise some

24   First Amendment right, I can't go to The Dominion or Sonterra

25   and start putting up signs.  I don't own property there.  I

1  don't live there.  I don't have any permission to put my signs
2  up there.  I don't know how you're going to overcome that.
3         And then the other problem in this case too is what
4  are we fighting about?  I mean, I know you are challenging the
5  City ordinance, but even if you are successful in fighting the
6  City ordinance on either vagueness grounds or other grounds,
7  she lives in an HOA, and the HOA, through its contractual deed
8  obligations with the homeowners there, are going to trump all
9  of that and she is still going to be subject to the
10 limitations of signage in her HOA; am I correct?
11        MR. NAJVAR:  No, your Honor.  No, you're not,
12 because, I mean, first of all, there is nothing in the record
13 that establishes what the HOA's restriction on signs are.
14        THE COURT:  No, I'm talking big picture.  I'm talking
15 about, what are we doing here?  So we can fight the City of
16 Shavano Park, but even if you are successful, what's that
17 going to get you?
18        MR. NAJVAR:  Well, it removes the entire sign code.
19        THE COURT:  And, so, okay.  Correct.  So then what's
20 it going to do in the HOA itself?  I mean, how is she now
21 going to be able to put up more signs than the deeds allowed
22 by the HOA there are going to allow?  How is that going to get
23 her what she wants, absent her moving to some area that
24 doesn't have an HOA?
25        MR. NAJVAR:  Well, if I -- I mean, it's hard to

1  respond to that when there is nothing in the record that

2  establishes what the HOA --

3      THE COURT:  You are fighting legalese and I'm talking

4  big picture.  What is your client going to get?  I mean, why

5  is she spending money on attorney's fees, and at the end of

6  the day what is it going to get her?  I'm talking big picture.

7  I'm not talking about the pleading deficiencies or anything

8  else.  I'm just trying to get you-all to understand, what's

9  the big picture here?

10      MR. NAJVAR:  The big picture is, first of all,

11  although it's not in the record, I believe that the fact would

12  be shown, you know, if we put it in the record, that she has

13  far more room to maneuver with putting signs in her yard.

14      THE COURT:  So you looked at the HOA deed

15  restrictions and you think she's going to be able to get a lot

16  more signage in there, if you're able to strike down the City

17  ordinance?

18      MR. NAJVAR:  Well, that's my belief, based on

19  conversations and based on my general understanding.  I have

20  not gotten the actual agreement.

21      THE COURT:  So what I was just trying to get you and

22  your clients to understand is, you know, sometimes in lawsuits

23  we've got to look at the bigger picture, what is it going to

24  get us?  Other than spending a lot of attorney's fees, other

25  than investing a lot of emotional energy in a case, you know,

1  you've got to look at, what am I ultimately going to end up

2  with?  And so if she wins here, great for her.  But then what

3  happens with the HOA?  And then all of a sudden, oh, my

4  goodness, what kind of a win was this?  And then at what cost,

5  both emotionally and financially?

6          MR. NAJVAR:  I understand the question.  Even though

7  I can't give you have the specifics now, I do believe that the

8  record will show if the sign code is removed she will have far

9  more room to put up signs, you know, after that fact.  And I

10 think the fact that the Homeowners' Association president

11 resorted to calling the City to enforce the sign code rather

12 than following their procedures, you know, testifies to that

13 fact.

14         THE COURT:  I'm not sure about that, but it does

15 testify to the contentiousness of the neighborhood.  So, you

16 know, there we are.  So with regard to the motion to dismiss,

17 that's denied.  There is enough alleged procedurally to get us

18 past the procedural defects.  There is claims against the

19 residences and injury with chilled right to expression, and so

20 let's talk about, where do we go forward from here on

21 discovery?  What do you think you are going to need?

22         MR. NAJVAR:  Your Honor, and just, I want to put one

23 thing on the Court's mind.  In light of the order that Smoot

24 should file a separate lawsuit, another --

25         THE COURT:  And, by the way, that doesn't have to

1  come to me, so...

2  　　　　MR. NAJVAR:  Well, but respectfully, I mean, I think

3  I'll probably file a motion to consolidate, frankly, because

4  otherwise I'm dealing with two separate sets of hearings and

5  lawyers.

6  　　　　THE COURT:  So I wouldn't mind, just for discovery

7  purposes consolidation, and so you do file the other lawsuit

8  and just note it's a related case, I'll consolidate for

9  discovery so we try to make this cheaper.  But ultimately, if

10  the fight continues for trial, this is where I think the

11  factual -- and maybe I'll change my mind for time of trial, if

12  we have to go there, that maybe as we start narrowing the

13  issues, we see what's left and what may or may not be

14  confusing to a jury, and maybe I'll consolidate for trial

15  purposes too, but for right now you need to file a separate

16  lawsuit.

17  　　　　MR. NAJVAR:  Okay.  And just to let -- so part of the

18  proposed amendment was to add this claim that the City -- the

19  state law claims that weren't in the original complaint, so

20  I'll be filing a motion to add those claims to Fanning's

21  lawsuit as well, even though I'll file Smoot separately, but

22  they are both going to make those same claims.

23  　　　　THE COURT:  Got it.

24  　　　　MR. NAJVAR:  So in terms of discovery, your Honor, I

25  really see this case as, you know, a case that's -- can go off

1    on dueling motions for summary judgment.  I don't anticipate a

2    trial will be necessary.  I don't have to go into specifics,

3    unless you want it, but I think there is a few of the claims

4    that --

5            THE COURT:  I'm just curious about for discovery.

6    Who do you need to depose?

7            MR. NAJVAR:  Well, I need to determine -- basically I

8    need evidence about what -- somebody who can speak on behalf

9    of the City, or the police department, to help me -- to

10   illustrate how they actually have enforced certain parts of

11   this to the extent that goes to my vagueness claims.

12   Especially, for example, there may be some evidence like from

13   the City manager, or from somebody on the City council, or

14   others who can speak to the political background to the

15   extent --

16           THE COURT:  Why would that be relevant?

17           MR. NAJVAR:  Sometimes the motivation, although you

18   don't need to prove motivation for facial First Amendment

19   claims, or for First Amendment claims, if you prove that a law

20   was motivated by political animus, then that becomes -- that

21   could --

22           THE COURT:  But I thought all these ordinances were

23   enacted prior to Smoot and everybody else.

24           MR. NAJVAR:  No.  And I don't discuss it here because

25   I started off just basically saying, you know, I don't need to

1  get into a bunch of factual discovery with the City council

2  members and their motives, because there is clear arguments

3  that I have.  But I think I will start — you know, I don't

4  want to leave valid claims out of the case, just to leave them

5  out.

6          THE COURT:  Well, I understand that.  But before you

7  start deposing City officials, you're going to need to

8  establish for me that these ordinances were enacted after any

9  of this kind of challenged facts here, because what I don't

10  want to turn this case into is apparently there is some

11  measure of disgruntlement in Shavano Park, and I ain't going

12  there.  Okay?  So we are just going to deal with the legal

13  issues here and I'm not dealing with anything else.

14          So no City councilmen or aldermen, or whatever they

15  are called over there, depos, unless you can establish for me

16  that they took votes on something that's relevant here time

17  frame wise.  Is that fair?

18          MR. NAJVAR:  Yes, your Honor.

19          THE COURT:  So, yeah, I understand then the need for

20  a 30(b)(6) of somebody from Shavano Park to talk about

21  enforcement mechanisms.  And the only thing I would ask both

22  you-all to consider here, let's make this a lot more detailed

23  than what I saw in the complaints.  I want to know exactly

24  where someone tried or actually did put a physical sign, where

25  someone tried or was hoping to put some kind of a banner sign.

1   And I want to know whether those were properties inside the

2   City -- of course, inside the City limits -- I want to know is

3   it the home subdivision that Miss Fanning lived in, or are we

4   talking about some other site?  I want you-all to be very

5   specific.

6           And let me suggest to you this.  So I had a case,

7   God, I don't know, 25 years ago with the City of San Antonio.

8   I represented the City of San Antonio against firefighters.

9   And the sole legal challenge was whether or not the collective

10  bargaining agreement that the City entered into with the

11  firefighters violated USERRA, the Veteran's statute for

12  employment and reemployment rights.  You know, we didn't have

13  to go through a lot of depositions and all of that.  That was

14  just like a legal tee-up of did this collective bargaining

15  agreement violate USERRA, and this is sort of the same kind of

16  situation.

17          You lay out for me the facts, and then lay out for me

18  the City ordinance, and then -- so you should be able to reach

19  a lot of agreements as to a lot of the underlying fact issues

20  because there shouldn't be fact issues.  A lot of this ought

21  to be straightforward.  Both parties stipulate the following,

22  one, this ordinance was entered on this date, effective this

23  date.

24          And so I envision this case where both of you try to

25  work together cooperatively.  We ought to have a whole bunch

1  of agreed factual statements and then we just talk about how

2  the law is applicable to those facts.  So that's where I would

3  like y'all to end up, if at all possible.

4          MR. NAJVAR:  I agree, your Honor.  I agree.  And

5  that's why I say I believe it's going to turn on just summary

6  judgment motions after just some limited discovery.

7          THE COURT:  I don't know if I let you talk at all,

8  Mr. Frigerio.  Do you want to say anything?

9          MR. FRIGERIO:  Other than that was my understanding,

10 I believe that the facts of the case are the fact that it was

11 not any banner or sign on her property, Miss Fanning's.  And

12 since we are talking about the Homeowners' Association, I

13 think the cases we cited regarding also under Texas law is

14 that one person of a Homeowners' Association cannot bring a

15 suit that affects the whole Homeowners' Association.

16          THE COURT:  Right.  And so that's why -- I was

17 looking at your motion to dismiss and I thought it might have

18 some merit, except for, I mean, she did try to get three other

19 homeowners in the subdivision, and she got -- at least that's

20 what the pleadings allege -- permission to put these signage,

21 and they were forced to not put them up and were chilled

22 because of the enforcement of the City ordinance.  That's the

23 way I understood this.  So a chilling could be an injury, and

24 so that's why I'm letting this case go forward.  And that's

25 why the motion to dismiss is denied.

1        But when we go forward for the summary judgment, you

2   know, let's try to -- and, you know, another mistake that a

3   lot of us make here in the Western District of Texas, I don't

4   want to hear plaintiff's agreed fact statement and then

5   defendant's agreed fact statement.  That means there is not

6   any kind of an agreement of facts.  And then likewise, to the

7   extent that there is agreement on propositions of law, let's

8   try to lay those out so I can get to this as expeditiously as

9   possible.

10        MR. FRIGERIO:  Thank you, your Honor.

11        THE COURT:  Thank you.

12     (Concludes proceedings.)

13                        *****

14                      CERTIFICATE

15   I, Gigi Simcox, RMR, CRR, Official Court Reporter for the

16   United States District Court, Western District of Texas, do

17   hereby certify that the foregoing is a true and correct

18   transcript, to the best of my ability and understanding, from

19   the record of the proceedings in the above-entitled and

20   numbered matter.

21

22                        s/Gigi Simcox, RMR, CRR

23             Gigi Simcox, RMR, CRR
             Official Court Reporter

24

25