

Transcript of the Testimony of

**Etta Fanning**

**Date:**

October 03, 2019

**Case:**

ETTA FANNING vs CITY OF SHAVANO PARK



**KIM TINDALL & ASSOCIATES**

Nationwide Court Reporting & Litigation Support

**866.672.7880**    info@KTandA.com

Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
      ETTA FANNING,                )
 4         Plaintiff,              )
                                   )
 5    VS.                          ) Civil Action
                                   ) No. 5:18-CV-0803-XR
 6    CITY OF SHAVANO PARK,        )
      TEXAS,                       )
 7         Defendant.              )

 8

 9

10                    ORAL DEPOSITION OF

11                      ETTA FANNING

12                     OCTOBER 3, 2019

13

14

15        ORAL DEPOSITION of the witness, ETTA FANNING, taken

16   at the instance of the Defendant, in the above entitled

17   cause, before CATHEY RIMMER, Certified Shorthand

18   Reporter in and for Bexar County, Texas, on October 3,

19   2019, in the Law Offices of Charles S. Frigerio, 111

20   Soledad, Suite 840, San Antonio, Bexar County, Texas,

21   between the hours of 10:03 o'clock a.m. and 12:00

22   o'clock p.m., pursuant to the Federal Rules of Civil

23   Procedure and the provisions stated on the record or

24   attached hereto.

25                    *-*-*-*-*-*-*-*
```

Exhibit 1

```
 1              A P P E A R A N C E S

 2

 3    APPEARING FOR PLAINTIFF:

 4         NAJVAR LAW FIRM, PLLC
           Mr. Austin M.B. Whatley
 5         2180 North Loop West, Suite 255
           Houston, Texas   77018
 6         (281) 410-2003

 7

 8    APPEARING FOR DEFENDANT:

 9         LAW OFFICES OF CHARLES S. FRIGERIO, P.C.
           Mr. Charles S. Frigerio
10         Mr. Hector X. Saenz
           111 Soledad, Suite 840
11         San Antonio, Texas   78205
           (210) 271-7877

12

13    ALSO PRESENT:

14         ETTA FANNING
                The Witness
15
           MR. BILL HILL
16
           CATHEY RIMMER
17              Certified Shorthand Reporter
                in and for the State of Texas
18

19                   * - * - * - * - * - * - *

20

21

22

23

24

25
```

```
 1          A.   Yes.

 2          Q.   Okay.  Also, after retiring did you dabble in

 3   politics as far as running for city council?

 4          A.   Yes, I did.  In 2010 I ran for city council and

 5   I won, and I was on city council 2010 to 2014, and --

 6          Q.   So did you run twice or are they four-year

 7   terms?

 8          A.   Two-year terms.  I ran twice.

 9          Q.   Okay.  And is that the only two times you ran

10   or did you run a third time and weren't elected?

11          A.   I ran a third time.  We couldn't get anybody

12   else to run who we thought would carry across the

13   conservative ideas that we had.  So I ran a second

14   time -- I mean, a third time and I lost.

15          Q.   That would have been 2016?

16          A.   I believe so, yes.

17          Q.   So you've run three times altogether?

18          A.   Three times and lost one, won two.

19          Q.   Okay.  Were you -- during your tenure was Bill

20   Hill the city manager?

21          A.   Partly, yes.  During my tenure I was part of

22   the council who hired Bill Hill and interviewed and met

23   him and his wife at some of our meet and greets and was

24   part of that team who brought him on board.

25          Q.   And I realize you're suing the City of Shavano
```

Exhibit 1

1  the parties.  There was never a word.

2        Q.  Let me ask you a little bit about the parties.

3  What's the purpose?  Just to celebrate the 4th of July?

4        A.  That specific party?  4th of July?

5        Q.  Yes.

6        A.  Yes, we have a lot of seniors and elderly

7  people in our neighborhood, veterans, and the 4th of

8  July party is to celebrate the 4th of July, America.  We

9  line the street with flags.  We put flags up and down

10 the -- I mean, on the outside.  We hang our flags on

11 flag holders outside our houses, and we decorate red,

12 white and blue everywhere.  We put up big red, white and

13 blue canopies, tents, at the end of our neighborhood, at

14 the end of our cul-de-sac street, and about 70 to 100

15 people attend.

16       Q.  And was that your idea to start that

17 celebration at the Bentley Manor homeowners area?

18       A.  Not just me.  I'm the coordinator of our

19 Neighborhood Watch program.  It's a safety program that

20 we work with in coordination with our police in Shavano

21 Park, and I started that around 2010 with just a few of

22 us walking door and door and asking if people wanted a

23 Neighborhood Watch in their neighborhood, and we got 200

24 signatures of people who said yes.  So we started

25 Neighborhood Watch, first in Bentley Manor, and then

Exhibit 1

1  we've spread it throughout the City of Shavano Park to
2  include everyone.  So part of that Neighborhood Watch
3  effort was to support events like July the 4th.  So I
4  coordinate that Neighborhood Watch program, but the July
5  the 4th was not my event.  It was neighbor watch, which
6  is volunteers.  We usually have about 20 volunteers who
7  work together to deliver invitations and put them on the
8  door and send email to our neighbors, and we have block
9  captains who distribute this information.  There are
10  about, I guess, about 35 block captains, and they
11  distribute the information throughout the city.  And so
12  it's just a neighborhood event to create a community
13  that's friendly and who care about each other.  That's
14  what 4th of July is about.

15       Q.  So it really wasn't -- it's not a money-making
16  event.  No one charges for it.

17       A.  And no one pays for it but us, the volunteers.

18       Q.  And as far as the two banners that we're
19  talking about in this lawsuit in 2018, did you purchase
20  those two banners?

21       A.  Yes, I did.

22       Q.  And why did you purchase as opposed to anyone
23  else?

24       A.  Because I volunteered.  It's my contribution to
25  the community.  I give to charities, and so the

Exhibit 1

 1   community is important to me so I purchased the banners,
 2   and we give away whistles and little safety bracelets
 3   and things like that, and I've purchased those as part
 4   of the volunteer -- as a volunteer effort on my part.
 5   I've also had a few donations from the developer who
 6   believes that these parties are important for the
 7   community he developed, and Denton Developers have
 8   donated -- one year they donated $1,000.  Another year
 9   they donated $1,000, and it was just to help out with
10   the expense of having a neighborhood get-together.
11       Q.  So where would that money go when they donated?
12   Is there a homeowners fund?
13       A.  This has nothing to do with the homeowners.
14   These were private individuals.  The homeowners
15   association has always -- I mean, I send invitations and
16   letters to the homeowners association, and they've
17   always approved these and they usually come.  They've
18   never denied having a party in our community.
19       Q.  Can you give us a rough idea how much those two
20   banners would have cost you?  This is being the ones in
21   2018.
22       A.  I don't remember.  I would have to find the
23   invoice.  I don't remember.  They're professionally made
24   banners by Vista Print, and they are --
25       Q.  Do you have to get a new one every 4th of July?

1       A.   No.   No, because we just put, You're invited to
2    4th of July, and we always have our event on 4th of
3    July, and 4th of July is 4th of July.

4       Q.   So you might have had them for years then?

5       A.   These banners we had had -- this was the second
6    year.  We didn't always have banners.  Sometimes we just
7    had handmade signs and printed signs, but we decided to
8    make it look nicer and have banners.  So we'd use the
9    banners -- I think these banners we had used -- we had
10   used those banners twice.

11            Now, the 4th of July raincheck block party,
12   that was a new banner because that was a raincheck.  We
13   did that one on July the 28th.  We put them up on the
14   26th, and the party, I think, was on the 28th because a
15   storm blew down the original 4th of July event.  In
16   fact, all the canopies and everything went flying over
17   the fence.  So we bought all new stuff, all new
18   canopies.  We bought -- made new banners and started all
19   over and put them up for the July 28th.  So all that was
20   new, new supplies.

21       Q.   And those, again, would also have been put up
22   on the north and south gates of the homeowners entrance?

23       A.   Yeah, inside the gates.

24       Q.   Right.

25       A.   They're inside.  They're not exposed to the

Exhibit 1

1  street.

2      Q.  But it would be on homeowners association

3  property?

4      A.  Yes, it's an area just right next to the gate

5  where we'd always put them.

6      Q.  And do you keep those signs then at your

7  residence when it's finished?

8      A.  Yes.  Yes, sir.  They go in the top of my

9  garage usually.

10     Q.  And those are the two banner signs that we are

11 talking about that are the subject of your lawsuit?

12     A.  Yes.  We never got any of those things back.

13     Q.  Did someone take your banner signs?

14     A.  The city did.

15     Q.  The city took your -- which one of the banner

16 signs?

17     A.  Both.

18     Q.  Both the July 4th and the raincheck?

19     A.  No, we're talking about the raincheck.

20     Q.  Just the raincheck?

21     A.  Yes.  I mean, that was what your question

22 pertains to --

23     Q.  Right.

24     A.  -- because I said I was not here for July the

25 4th.  I was in Germany with my grandson.

1   preparation for that party is the same every time.  We
2   put up five canopies.  They're red, white and blue, and
3   we put them up at the end of the cul-de-sac in front of
4   her house, and we set up about six long tables and
5   decorate them with red, white and blue and put up
6   wreaths and flags.  It's an elaborate -- it takes -- we
7   usually have about ten volunteers, and it takes two
8   hours to set it up.

9       Q.  Okay.  Now, we've talked about the banners, I
10  think, for both 4th of July typically and then the
11  raincheck.  Besides the banners, there's also part of
12  your complaint about signs.  So did you place any signs
13  for either the 4th of July or the raincheck on any
14  property located in Bentley Manor?

15      A.  I don't know about the 4th of July because I
16  wasn't there.  But for the raincheck for the 28th, on
17  the 26th, I believe it was -- we usually set up our -- I
18  mean, put the invite at the gate and all that about a
19  couple of days before.  It's usually within sometimes
20  four or five days or two days, a few days before so that
21  residents as they go in and out the gate can see that
22  they're all invited to a block party, a community party.
23  So I remember -- I mean, I remember because I read an
24  email just to refresh myself.  On July 26th I was part
25  of putting up the two banners at the gate and placing

Exhibit 1

1  three signs in residents' yards after we asked them for
2  permission.

3      Q.  And how many -- okay.  Back up again.  How many
4  different residences?

5      A.  We had three.

6      Q.  Three?

7      A.  Three residents gave us permission to put up
8  regular -- they're election-size signs.  I don't know.
9  24 by 18, something like that.  They're election-size
10  signs.  They're small signs.  And they gave us
11  permission to put them in their yard.

12      Q.  Which three residents were those?

13      A.  I don't know.  I mean, I don't remember now,
14  but it was three residents in our community.

15      Q.  That you personally went to and spoke to?

16      A.  Yes.

17      Q.  And where did you place the signs?

18      A.  We thought we placed them on their property at
19  the edge of the curb so that people driving by could see
20  them, and the signs just said, You're invited to a 4th
21  of July -- You're invited to a raincheck 4th of July
22  party, and it gave the address of where the party was.
23  That's all it said.  And the time.

24      Q.  Are you familiar with any of those signs being
25  taken by the city?

1        A.   The city took all three signs.

2        Q.   But you don't know the names of the residences

3   where you put the signs?

4        A.   No, I just went to the door and asked if -- I

5   said, you know, We're having a 4th of July party and can

6   we put a sign in your yard?  Two of them I didn't know.

7   I had not met them before.  And the other one I had met

8   but I didn't really know real well.  And they all just

9   said, Sure, no problem.  I mean, people in our

10  neighborhood, in our community, Bentley Manor, have

11  always supported these block parties.

12       Q.   And so these signs would have been placed near

13  the curb?

14       A.   Right, near the curb.  Or if they were on a

15  corner lot, kind of on the corner near the curb.  We

16  wanted them to be visible.  So they gave us permission,

17  and we placed the signs next to the curb.

18       Q.   Since you know exactly there were three

19  residences that you made contact with --

20       A.   Well, I know there were three because there

21  were three signs.

22       Q.   Okay.  One of the signs was for an Ernest and

23  Laurie Barberio -- B-a-r-b-e-r-i-o -- at 202 Farn

24  Castle.  Does that sound familiar?

25       A.   No.

Exhibit 1

 1  those.  If I have something to contribute as a citizen
 2  or a question, there's a time when citizens are open to
 3  speak on those things.  So sometimes I speak and
 4  sometimes I don't.  But our relationship -- our
 5  conversations have always been friendly, and I
 6  compliment him and his wife often on the work they do in
 7  our community.  There has never been an issue or a
 8  problem until this.  This is a total surprise.
 9      Q.  Did you ever -- did you put -- this last July,
10  which would be July of 2019, did you put up banner signs
11  for the 4th of July party?
12      A.  I didn't.  I wasn't here.  I was in Germany.
13      Q.  For 2019?
14      A.  For 2019.  Oh, 2019, yes, with permission of
15  the homeowners association and a letter from the
16  residential community saying that they were glad we were
17  doing this and that banners were allowed but the city
18  would not permit it.  So we didn't put a banner.  We put
19  a little sign at the entrance.  We could not put a
20  banner.  They said -- let me remember.  The
21  homeowners -- Camille.  Camille wrote to me in response
22  to my request for permission to put up the 4th of July
23  banners.  We had some real small ones.  They were much
24  smaller than these for this 4th of July.  And she said
25  that the homeowners association approved it and it was

Exhibit 1

1   fine with them, but she called the city and the city

2   would not approve it, that Bill Hill said no banners

3   were allowed in Shavano Park.

4        Q.   So there was no banner this past year?

5        A.   No banner.  But she said, The homeowners

6   association has approved you to put signs in the common

7   areas if you want to.  So we put signs.  We made little

8   signs, election-size, and put them out by the gate, and

9   the homeowners association approved that.

10       Q.   Nobody took those signs down, did they?

11       A.   No.

12       Q.   But you still never spoke with Mr. Holzhauer

13  about the banner?  Even in 2019 you didn't speak to him

14  about it?

15       A.   You mean a personal conversation?

16       Q.   Yes, correct.

17       A.   I sent an email to the board and to the

18  residential management.  I sent the letter to the board.

19  I sent a letter to all three members of the board -- I

20  mean, an email, and told them that we were planning

21  another 4th of July party and could we have permission

22  to put banners at the gate, inside the gate, we'd put

23  them up a certain day and we'd take them down a certain

24  day and did we have permission?  The response I got was

25  from the residential manager saying the board had

Exhibit 1

 1 | approved the banners and the signs in celebration of 4th
 2 | of July in Bentley Manor -- this is 2019 -- but that the
 3 | city would not approve the sign -- I mean, the banners.
 4 | And I said, Who did you talk to and why is there a
 5 | problem?  They said, Bill Hill said that absolutely
 6 | there will be no banners allowed in Shavano Park.
 7 |     Q.  Who's the person that told you that?
 8 |     A.  I have the email from Camille.  I think her
 9 | name is Camille Belcher.
10 |     Q.  I think my original question was in 2019 did
11 | you ever speak to the homeowners association president,
12 | Mr. Holzhauer, about the banners?
13 |     A.  That's not the procedure.
14 |     Q.  Again, that's not my question.  Did you ever
15 | speak to Mr. Holzhauer about the banners in 2019?
16 |     A.  No.
17 |     Q.  Is he on the board?
18 |     A.  He's one person on the board.
19 |     Q.  Is he still the president of the homeowners
20 | association?
21 |     A.  Yes.  I spoke to all three through an email.
22 |             (Deposition Exhibit 5 was marked.)
23 |     Q.  (BY MR. FRIGERIO)  Let me show you what has
24 | been marked as Deposition Exhibit Number 5, which is
25 | some text messages from Adam Holzhauer.  Have you ever

Exhibit 1

1  were all placed on residences that were inside Bentley

2  Manor?

3      A.  Yes.

4      Q.  And your position is that all three of those

5  signs were taken and you don't know what happened to

6  them?

7      A.  Correct.  I don't know what happened to them.

8      Q.  And the banner signs were also taken down?

9      A.  Yes.

10      Q.  Do you know who took the banner signs and the

11  three signs?

12      A.  No, I don't.  I don't know who took them.  Bill

13  Hill said he would have the chief of police call me, and

14  no one ever called.  So I was never told who took the

15  signs.  The way I found out who took the signs was when

16  my attorney then called and found out the information

17  about where the signs were and could I have them back

18  and all of this, and so after that my attorney spoke

19  with the city.  I didn't speak with them ever.  I never

20  heard from anyone then or since then to this day about

21  any of that.

22      Q.  You've never spoken with Bill Hill about this

23  issue?

24      A.  No.

25      Q.  Or Chief Lacy?

1  it wasn't a money-making operation anyway, correct?

2       A.   No, it never is a money-making.  That's not

3  what we base it on.  We base it on how many attend.  And

4  those people come out, and we are a stronger community

5  the more people who attend.

6       Q.   And in October, a few days ago, 2019 and as

7  well as October of 2018 there were banner signs for the

8  National Night Out placed on Bentley Manor, correct?

9       A.   Yes.

10      Q.   And that celebration did go forward both times,

11  in 2018 and 2019?

12      A.   Yes.

13      Q.   You haven't run for office again since 2016 in

14  Shavano Park?

15      A.   Yes, I ran for Republican political precinct

16  chair for a precinct of Shavano Park, and I've done that

17  for about -- since 2010.  It's a two-year term, and I

18  have been elected over and over.  I just resigned that

19  position recently because I'm out of town a lot, so I'm

20  no longer that precinct chair.

21      Q.   When was the last time you ran for that?

22      A.   2016.

23      Q.   And you were elected to a two-year term or is

24  it a four-year term?

25      A.   Two.  No, I'm sorry.  It's four.

Exhibit 1

```
 1        Q.  Four.  And that's why you had to resign?
 2   Because your term hadn't expired?
 3        A.  Right.
 4        Q.  When you ran in 2016, did you place signs up,
 5   political signs?
 6        A.  Yes.
 7        Q.  Those signs were not removed by anyone,
 8   including the city?
 9        A.  No, because they followed this.
10        Q.  They followed the ordinance?
11        A.  They followed this ordinance of when they could
12   be put up and when they can be taken down, and no sign
13   was ever put up without asking permission in somebody's
14   house.
15        Q.  And you were elected?
16        A.  I was elected.
17        Q.  The homeowners association, how many members
18   are on that board?
19        A.  Board members?
20        Q.  Yes.
21        A.  For Bentley Manor?
22        Q.  Bentley Manor, yes.
23        A.  Three.
24        Q.  Adam Holzhauer, he's the president still?
25        A.  Yes.
```

Exhibit 1

1        Q.   At your home.

2        A.   No.

3        Q.   You never have placed any signs concerning the

4   4th of July or the raincheck block parties on your home?

5        A.   Oh, yes, I have.   I mean, I have put one out by

6   the curb at my home for 4th of July, for the 4th of July

7   and for National Night Out, just small little signs

8   because I live on the end of a cul-de-sac.   And so, yes,

9   I have, but the party is not at my house.

10       Q.   For the purposes of the lawsuit though, we're

11  talking about July of 2018, which I understand from your

12  testimony the July 4th party you were in Europe,

13  correct?

14       A.   July the 4th I was in Europe.

15       Q.   Right.   So for the raincheck party on

16  July 28th, 2018, you did not place signs or banners at

17  your residence?

18       A.   No, not for that day, but you asked me if I had

19  ever.

20       Q.   Right.   I realize that.

21       A.   Okay.

22       Q.   I just want to limit it now to your lawsuit.

23       A.   All right.

24       Q.   For your lawsuit you did not during that time

25  frame?

Exhibit 1

| 1 | EXAMINATION |
| 2 | BY MR. WHATLEY: |
| 3 |     Q.  So I'm going to go through my questions so it |
| 4 | may be a little duplicative, but if you can just go |
| 5 | ahead and answer to the best of your abilities.  How |
| 6 | long would you say that you have been hanging banner |
| 7 | signs prior to 2018? |
| 8 |     A.  Nine or ten years. |
| 9 |     Q.  Did you ever get any complaints from the HOA |
| 10 | before? |
| 11 |     A.  No. |
| 12 |     Q.  How about from the city? |
| 13 |     A.  No. |
| 14 |     Q.  Had anyone ever removed any of these signs |
| 15 | before? |
| 16 |     A.  No. |
| 17 |     Q.  Previously how would you get authorization to |
| 18 | hang these signs? |
| 19 |     A.  Through -- previously through I would send an |
| 20 | email to the board members of the HOA.  Before Adam I |
| 21 | sent it to Eugene Costello and the board.  He was |
| 22 | president then.  And then after Adam was elected I would |
| 23 | send an email to Adam and whoever the board members |
| 24 | were.  Now it's Bill and John.  And so I sent an email |
| 25 | to the board members, and then we have had permission to |

Exhibit 1

1    put up the banners and have the block parties for all
2    these years.

3        Q.   And for those previous years how did you get --
4    how did they respond to your request to hang these up?
5    Just send you an email back?

6        A.   By email.  Sometimes the -- it used to be
7    mostly just the board members would respond, but now we
8    have more of a -- FS Residential is a management company
9    that is a professional management company, and so the
10   responses that we get back now from the board as a board
11   is usually through the management company rather than
12   the individual HOA board members.

13       Q.   Okay.  Now I want to talk specifically about
14   these three small signs.  To your knowledge, you put
15   those on private property?

16       A.   Yes.

17       Q.   Okay.  And did you ever receive these signs
18   back?

19       A.   No, I never received any signs back.  Wait.
20   Let me think.  Let me think a minute.  We did not
21   receive two signs back.  One sign was replaced or put
22   back in the yard, in one of the yards, so we did receive
23   one sign back.  So I correct myself.  We received one
24   sign back but not the other two signs or the banners.

25       Q.   And that was the sign that they would have --

```
 1  that they told you was placed on private property
 2  originally?
 3       A.  Correct, yes.
 4       Q.  Okay.  Now I want to talk about the banner
 5  signs.  You usually placed those on HOA property right
 6  at the entrance and exits, correct?
 7       A.  Just at the exit.
 8       Q.  At the exit?
 9       A.  At the exit of the north and south gate.
10       Q.  If the sign code allowed you to, would you want
11  to place banner signs at other locations, whether it be
12  your property or with the permission of other residents
13  in Bentley Manor?
14            MR. FRIGERIO:  Objection; form.
15       Q.  (BY MR. WHATLEY)  If the sign code allowed,
16  would you like to place banner signs on your own
17  property?
18            MR. FRIGERIO:  Objection; form.
19            THE WITNESS:  Do you want me to answer or
20  what?
21            MR. FRIGERIO:  No, you can go ahead and
22  answer.
23            MR. WHATLEY:  You can go ahead and answer.
24            MR. FRIGERIO:  I just have to make
25  objections for the record.
```

Exhibit 1

1           THE WITNESS:  Oh, yes, because the banners
2   are the way that we advertise our block parties.  It
3   gets really expensive when you have individual
4   homeowners paying for all this expense, for invitations,
5   postcards.  We don't have a city budget or a budget for
6   doing this.  We just reach in our pockets and pay for
7   invitations and banners and postcards that are to be
8   mailed out, and so we've tried to cut costs by figuring
9   out ways to invite the neighbors without spending so
10  much money out of each of our pockets.  So we came up
11  with the idea of banners a while back because we can put
12  those at the exit of each gate, and everybody in the
13  community who leaves Bentley Manor can see it, and that
14  way we don't have to send post -- you know, postmarked
15  postcards and things like that.  So it saves us a lot of
16  money to be able to put up a banner at the exit gate so
17  that everybody can see it.

18          Q.  Let me ask this in a different way.  Would you
19  like to place a banner sign on your own property?

20              MR. FRIGERIO:  Objection; form.

21              THE WITNESS:  Well, yes, of course,
22  because, just like during National Night Out, banner
23  signs are placed in the individual yards where they have
24  the parties, the block parties.  We would like to place
25  them -- I live at the end of a cul-de-sac.  A lot of

Exhibit 1

 1 | people drive to the end of my cul-de-sac and turn around
 2 | and they walk that way.  So I would like to put a small
 3 | banner in my yard and sign in my yard that says you're
 4 | invited to a block party.  The more of these that we can
 5 | get out, the better it is to invite the neighborhood to
 6 | a block party.  It's just information.  The city does it
 7 | but they don't permit the residents to do it.
 8 |      Q.  Do you want to hang banner signs in your
 9 | neighbors' yards?
10 |      A.  With permission, yes.
11 |      Q.  Next I want to turn to the 2019 block party,
12 | the July block party.  So this year again you wanted to
13 | put out signs for that block party, correct?
14 |      A.  Yes.
15 |      Q.  Where did you want to put them?
16 |      A.  The same place as before.  We wanted to hang
17 | two banners at the exit gates so that residents could
18 | see that we were having a patriotic 4th of July party,
19 | and we wanted to put some little things along the busy
20 | roads where there's high traffic so that as people drove
21 | by they could see that they're invited to a party.
22 | Again, it's just a way to get the information out to the
23 | community, and it's in our little gated community.  It's
24 | not out on a public street or anything.  It's in our
25 | little gated community, and we keep them there.  We put

Exhibit 1

1  them up a few days before the event and we take them
2  down immediately afterwards.

3      Q.  Were you able to hang banner signs for the 2019
4  block party?

5      A.  No.

6      Q.  Why didn't you?

7      A.  I sent an email to the three board members and
8  asked permission, and my response came back from the
9  residential manager who said the board members had
10 approved putting banners at the entrances but that the
11 city would not allow it.

12     Q.  Do you remember the name of the person you
13 spoke to?

14     A.  That I got the email from?

15     Q.  Uh-huh.

16     A.  Camille Belcher.  She's the FirstService
17 Residential manager.

18     Q.  Okay.

19     A.  And I asked her why.  I asked her why couldn't
20 we do it, who did she talk to.  I didn't know if she had
21 talked to the police or the city manager or who who
22 would say that we couldn't do it with permission of our
23 HOA, and she said she spoke to the city manager, Bill
24 Hill, and he said absolutely no banners would be
25 permitted anywhere in Shavano Park.  So she said, The

Exhibit 1

```
 1   board gives you permission but to comply with the city
 2   we will permit signs to go at the gates if you would
 3   like to put signs, but we're not approving banners
 4   because city denied, you know, access to do that.
 5       Q.   Was this the current procedure for requesting
 6   permission to put up a sign with the HOA?
 7               MR. FRIGERIO:  Objection; form.
 8               THE WITNESS:  I'm sorry.  I don't
 9   understand the question.
10       Q.   (BY MR. WHATLEY)  When you emailed Ms. Belcher,
11   is that the procedure for requesting permission to put
12   up a sign?
13       A.   Oh, yes.  Yes.
14       Q.   Okay.
15       A.   I also included the invitation that we stuck on
16   the doors of the residents and the city, and Ms. Belcher
17   sent that out to all of the Bentley Manor residents by
18   email, and I saw an email from Adam Holzhauer because I
19   sent -- I sent the invitation for the block party to all
20   three board members and with that invitation I said,
21   Here's what we're planning in Bentley Manor for the 4th
22   of July and we would like to -- we request to be able to
23   put a banner at the exit gates and a couple of signs out
24   so that residents will know that they're invited, and
25   here's the invitation that we're going to place on the
```

Exhibit 1

1  Oh, no, it does.  It's Fanning 8.  It's on the other
2  side.

3      Q.  (BY MR. WHATLEY)  Do you mind looking at that
4  highlighted portion for me?

5      A.  Okay.

6      Q.  And who is that email to and from?

7      A.  It's to Mr. Najvar, and it is from Daniel
8  Santee at Rampage-SA.com -- the attorney, I guess --
9  with a cc to Charlie Zech and Bill Hill.

10     Q.  And in that email -- let me rephrase that.

11             In that email is the sender saying that the
12 seizure of your signs was enforcement of the sign code
13 or of HOA policy?

14             MR. FRIGERIO:  Objection; form.

15     Q.  (BY MR. WHATLEY)  Is the sender of that
16 email --

17     A.  It's the attorney.  The sender of the email is
18 Daniel Santee.  And it says, One of the confiscated yard
19 signs was returned to its original location after
20 further review.  The others, however, were on HOA-owned
21 property without permission and in violation of the
22 ordinance.  Banner signs are allowed in residential
23 districts under very strict limitations concerning the
24 time of year.

25     Q.  Thank you.

 1                    THE WITNESS:  I personally don't, but I
 2   think that signs should be permitted within the state
 3   ordinances, within what the state code allows for
 4   political signs.
 5        Q.  (BY MR. WHATLEY)  So you would want to put up
 6   a --
 7        A.  I want the right to put up a sign within the
 8   state ordinance if I wanted to.
 9                    MR. WHATLEY:  Do you mind if I take five
10   just to make sure I got everything I want?
11                    MR. FRIGERIO:  Sure.
12                    MR. WHATLEY:  Thank you.
13                    (Recess from 11:53 to 11:59.)
14        Q.  (BY MR. WHATLEY)  Etta, when you place signs on
15   other homeowners' property, do you always get their
16   permission first?
17        A.  Yes.
18        Q.  Okay.  I have one more question.  What do you
19   want to get out of this lawsuit?
20        A.  I want the city to respect my First Amendment
21   rights and my freedom of speech.  I want the city to --
22   and I want the court to request that the city do this so
23   that this does not happen again in the future.  I
24   believe the citizens of our community, not just Bentley
25   Manor, the citizens of our community should be able to

Exhibit 1

 1 | put up a -- have a neighborhood party, put up a little
 2 | sign.  And I think that this was overuse and stepping in
 3 | of police power that the city used to enforce a sign
 4 | ordinance that is not constitutional.
 5 |     Q.  So you want to put signs up?
 6 |     A.  Sure.  I want to put signs up to invite people
 7 | to the events that we have to build our community.  I
 8 | want to put signs up for an election or for a
 9 | neighborhood event, signs up regarding -- I don't want
10 | signs to be selective.  If you're Suzy on the basketball
11 | team you can put up a sign, but if you're a Bentley
12 | Manor neighbor you can't put up a sign or a banner to
13 | invite people to a party.  The signs are restrictive and
14 | they're selective and they're enforced selectively, and
15 | I would like for that to stop because I think our
16 | citizens deserve better.
17 |             MR. FRIGERIO:  Object to the responsiveness
18 | to the question.
19 |             MR. WHATLEY:  Okay.  We're done.
20 |             MR. FRIGERIO:  We'll reserve our remaining
21 | questions.  Thank you.  We're done.
22 |             (Proceedings concluded at 12:00.)
23 |                     *-*-*-*-*-*-*
24 |
25 |